```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA,                      :
                                               :
            v.                                 :       MEMORANDUM & ORDER
                                               :       21-CR-383 (WFK)
DAQUAN MCGRIFF,                                :
                                               :
                        Defendant.             :
----------------------------------------------------------------X
```

**WILLIAM F. KUNTZ, II, United States District Judge:**

On March 23, 2022, Daquan McGriff ("Defendant") pled guilty pursuant to a plea agreement to the sole count of an Indictment charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). The Court now sentences Defendant and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is hereby sentenced to 41 months of imprisonment, to be followed by 3 years of supervised release, forfeiture in accordance with the Order of Forfeiture, and a $100.00 mandatory special assessment.

**DISCUSSION**

**I.     Background**

On July 26, 2020, New York City Police Department ("NYPD") officers received a radio transmission informing them a man in the East Flatbush area of Brooklyn, New York was reportedly in possession of a loaded firearm. Presentence Investigation Report ("PSR"), ECF No. 22, ¶ 6. Two officers conducting a routine patrol in the vicinity subsequently observed a man, later determined to be Defendant, who matched the transmission's description. *Id.* ¶ 7. When the officers exited their vehicle and attempted to approach Defendant, he fled, dropping a beige bag in the process. *Id.*

The officers pursued Defendant on foot and eventually apprehended Defendant and recovered his bag, which the officers discovered contained a loaded, nine-millimeter pistol bearing the serial number P1519516. *Id.* ¶¶ 7-8. Officials later conducted a review of Defendant's criminal

1

history, which revealed numerous felony convictions, including for robbery, attempted possession of a weapon, and distribution of controlled substances. *Id.* ¶ 9. A subsequent NYPD firearm inquiry also revealed the recovered weapon had been reported stolen. *Id.* ¶ 10.

On July 26, 2020, NYPD officers arrested Defendant and charged him locally for this offense. *Id.* The local matter was subsequently dismissed. *Id.* However, on July 28, 2021, Defendant was arrested again, this time by federal authorities. *Id.*

On July 29, 2021, Magistrate Judge Sanket J. Bulsara arraigned Defendant on a single-count Indictment charging Defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). Indictment, ECF No. 2. At his arraignment hearing, Defendant pled not guilty, and Magistrate Judge Bulsara ordered him released to home detention on a $75,000.00 unsecured bond with several conditions. *See* Order Setting Conditions of Release, ECF No. 5.

On January 21, 2022, Pretrial Services filed a Pretrial Violation Memorandum informing the Court Defendant had twice tested positive for illicit marijuana use and had left his home without pre-approval on several different occasions, in violation of both the terms of his release for the instant offense and the terms of his state parole stemming from a 2020 conviction for the criminal sale of a controlled substance near school grounds. *See* Violation of Release Conditions Report, ECF No. 16; PSR ¶ 41 (detailing Defendant's state offense). In response to Defendant's violations, Pretrial Services requested the Court hold a bond revocation hearing. *See* Violation of Release Conditions Report. The Court granted this request and subsequently held a revocation hearing for Defendant on February 11, 2022. On February 18, 2022 the Court revoked Defendant's bond and remanded him to federal custody, where he remains. *See* Remand Order, ECF No. 18.

On March 2, 2022, the parties informed the Court Defendant intended to change his plea. *See* Mot. to Continue, ECF No. 19. On March 23, 2022, Defendant pled guilty pursuant to a plea agreement to the Indictment's sole count.

The Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## II.      Legal Standard

18 U.S.C. § 3553 outlines the procedures for imposing a sentence in a criminal case. A sentencing court must also consider the Sentencing Guidelines in addition to the seven factors listed in 18 U.S.C. § 3553(a) when making a sentencing decision. The Court has done so in this case.

The Sentencing Guidelines are merely advisory in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 264 (2005). Nevertheless, the Guidelines range is the "starting point and the initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49. In this regard, the Guidelines provide "the framework for sentencing" and "anchor… the district court's discretion." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016) (internal reference and quotation marks omitted).

If and when a district court imposes a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and …the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for

so departing or varying "in a statement of reasons form." *Id.* "The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.).

This Court has considered the applicable Guidelines range as well as the seven factors listed in Section 3553(a). It addresses each in turn consistent with *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

**III.   Analysis**

  **A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

    **1.   <u>Family and Personal Background</u>**

Defendant was born on October 29, 1988 in Brooklyn, New York to the nonmarital union of Bryant McCaskill and Sharon McGriff. PSR ¶ 51. Unfortunately, Defendant's relationships with both of his parents have been strained for much of his life. *Id.* Defendant met his father for the first time when he was fourteen years old. *Id.* Up until that point in Defendant's life, Mr. McCaskill had been incarcerated, and while Mr. McCaskill eventually earned full custody of Defendant, Defendant was never able to live with him. *Id.* Despite this, however, Defendant reports he and his father are now close. *Id.* Although, he does not report the same for his mother. *Id.*

Defendant's mother has struggled with drug addiction since before her pregnancy with Defendant. *Id.* In fact, her drug use prompted her to abandon Defendant at a hospital's doorsteps when Defendant was just four years old. *Id.* Indeed, as a result of his mother's abandonment, Defendant spent the next two years in the foster care system, which appears to have caused him enduring harm. *Id.* ¶ 53.

Defendant reported on two occasions he was sexually abused by his foster father. *Id.* At the direction of a social worker, Defendant was medically examined and prescribed mental health counseling and medication as a result of this abuse. *Id.*

Defendant subsequently went to live with his paternal grandmother at the age of six. *Id.* He remained in her home until he was eleven. At which time, he was placed in Green Chimneys Group ("GCG"), apparently due to a combination of complications with his grandmother's health and upon a court order from Kings County Family Court following Defendant's juvenile arrest for assault. *Id.* ¶ 54. Defendant lived at GCG for the better part of one-year before he was discharged to Children's Village, a group home located in Dobbs Ferry, New York. *Id.*

Defendant resumed living with his grandmother when he was fourteen. *Id.* He remained there until her death, at which point Defendant began moving between various relatives' homes. *Id.* Defendant ultimately found stability living with his uncle in Brooklyn. He remained living there until his instant arrest. *Id.*

    2.    **Educational and Employment History**

Defendant attended Thomas Jefferson High School in Brooklyn up through eleventh grade. *Id.* ¶ 69. He eventually was forced to drop out from the school in 2008 due to his arrest for

disorderly conduct. *Id.* ¶¶ 25, 69. While incarcerated, Defendant attended general equivalency diploma ("GED") courses in 2020, but he never completed the curriculum. *Id.*

Defendant has had a difficult time sustaining employment, as well. *Id.* ¶¶ 71-79. He worked sporadically throughout his adult years, often in seasonal or temporary positions. *Id.* However, from 2019 until his instant term of incarceration, he was unemployed, subsiding on public assistance benefits. *Id.* ¶¶ 71-72.

Defendant has had two long-term romantic partners. *Id.* ¶ 55. He reported his first serious romantic relationship was with Felicita Garrett. *Id.* Their relationship lasted from 2017 until 2020. *Id.* At one point, the two were expecting a child together, but sadly Ms. Garrett suffered a miscarriage. This loss negatively impacted the couple's relationship. In fact, Ms. Garrett, who struggled with drug addiction prior to meeting Defendant, relapsed, and the relationship ultimately ended as a result. *Id.* Thereafter, Defendant became romantically involved with his now-fiancé, Dainty Carr. *Id.* ¶ 56. Ms. Carr is aware of Defendant's instant offense and has remained supportive of him. *Id.*

### 3.    Prior Convictions

Defendant's criminal history is extensive. *Id.* ¶¶ 24-49. His criminal record stems back to his teenage years and shows Defendant has been charged and convicted a total of seventeen times. *Id.* Perhaps more concerning, the record also reflects Defendant has rarely gone more than a few months between arrests and, even while serving custodial sentences, has had difficulty abstaining from illicit activity. *See, e.g.*, *id.* ¶ 39 (Defendant incurred 26 infractions between 2012 and 2017 while serving two successive terms of incarceration).

Defendant was only fifteen years old when he was criminally charged for the first time for committing assault in school. *Id.* ¶ 24. Approximately three years later, in July 2007, and again

in November 2007, Defendant was arrested and ultimately convicted of disorderly conduct. *Id.* ¶¶ 25-26.

In May 2008, Defendant was arrested and ultimately convicted again, this time for criminal mischief, a Class A misdemeanor, after he was found loitering and trespassing in the lobby of a victim, whom he had threatened with bodily harm after also displaying what appeared to be a gun. *Id.* ¶ 27. In June 2008, Defendant was arrested and ultimately convicted of criminal contempt in the second degree, another Class A misdemeanor, for violating the order of protection put in place following his arrest the month prior, and for threatening the same victim in that case with physical violence. *Id.* ¶ 28. Defendant received his first of many custodial sentences for this offense. *Id.* Indeed, his second custodial sentence followed soon thereafter. In August 2008, Defendant was arrested and later sentenced to a term of incarceration for robbery in the third degree, a Class D felony. *Id.* ¶ 29.

In July 2009, Defendant was arrested twice more. *Id.* ¶ 30. On both occasions, he was charged and ultimately convicted of criminal possession of a controlled substance in the seventh degree, a Class A misdemeanor. *Id.* ¶ 30. In August 2009, Defendant was arrested yet again, this time for criminal possession of a weapon in the fourth degree, a Class A misdemeanor. *Id.* ¶ 32. Defendant was arrested once more in September 2009 for menacing in the third degree. *Id.* ¶ 33.

In February 2010, Defendant was arrested and later convicted of criminal possession of a controlled substance in the seventh degree for a third time. *Id.* ¶ 34. Days after receiving his sentence for this offense, Defendant was arrested and convicted of intent to obtain transportation without paying, a Class A misdemeanor. *Id.* ¶ 35. The following month, Defendant was arrested yet again for attempted petit larceny, a Class B misdemeanor. *Id.* ¶ 36.

On January 9, 2011, Defendant was arrested, charged, and ultimately convicted of obstructing governmental administration in the second degree, a Class A misdemeanor, after he threw an unknown liquid onto the face, shirt, and arms of a correctional officer, causing said officer to be temporarily relieved of his duties. *Id.* ¶ 37. In June 2011, Defendant was arrested and later convicted of intent to obtain transportation without paying, a Class A misdemeanor, for the second time. *Id.* ¶ 38.

In December 2011, Defendant was arrested and ultimately convicted of attempted criminal possession of a weapon in the third degree, a Class E felony, for possession of a loaded caliber revolver. *Id.* ¶ 39. Defendant was sentenced to a custodial term for this offense and, while incarcerated, committed the crime of attempted possession of dangerous contraband in prison in the first degree, also a Class E felony. *Id.* ¶ 40.

Defendant was especially disruptive while serving custodial terms for these offenses. *Id.* ¶ 39. Records obtained from the New York State Department of Corrections and Community Supervision ("NYSDCCS") reveal, while incarcerated at the Bare Hill Correctional Facility between 2012 and 2017, Defendant received a total of 26 disciplinary infractions. *Id.* ¶¶ 39-40. These infractions were for such offenses as disobeying direct orders, harassment, creating disturbances, damaging property, drug use, making threats, possessing weapons, and assaulting prison staff, among others. *Id.* ¶ 39.

Defendant resumed his offensive conduct following his release. Prior to committing the instant offense, in November 2018, Defendant was arrested and subsequently convicted of criminal sale of a controlled substance near school grounds, a Class B felony. *Id.* ¶ 41. Defendant was sentenced to two years' custody for this offense. *Id.* Moreover, while serving his instant term of incarceration, Defendant received an infraction for threatening bodily harm. *Id.* ¶ 58.

### 4. **Medical and Mental Health**

Defendant's extensive criminal history makes clear he has a troubled past. The Court does not overlook the possibility Defendant's previous offensive conduct, and the instant conduct of conviction, may stem directly or indirectly from the unfortunate circumstance of Defendant's upbringing. As the Court has previously discussed, Defendant experienced physical and mental hardships in his youth, largely due to the sexual assault he experienced at the hands of his foster father. *Id.* ¶ 61. This abuse appears to have lingering effects today.

Defendant reported he began receiving mental health counseling and taking medication in his adolescence to help him cope with the trauma he experienced in his youth. *Id.* ¶ 62. Records obtained from Green Chimneys Group reveal several psychiatrists examined Defendant while he resided at the facility, who subsequently diagnosed him with fetal alcohol syndrome and severe attention deficit hyperactivity disorder ("ADHD"). *Id.* These doctors also determined Defendant required a higher level of care than the facility could provide. *Id.* Defendant was then referred to the Children's Village facility where he was prescribed Dexedrine (for ADHD), Thorazine, Depakote (an anticonvulsant), and Clonidine in an attempt to alleviate his ongoing behavioral problems. *Id.* Defendant was ultimately discharged from Children's Village in 2000 and was placed in Woodfield Cottage Detention Center—a housing facility for juvenile offenders. *Id.*

Between 2012 and 2017, while he was serving state sentences, Defendant's mental health condition worsened. *Id.* ¶¶ 63, 39-40 (detailing Defendant's state offenses). His mental issues escalated following the death of his grandmother and uncle, both of whom Defendant had lived with as a child. *Id.* Defendant has also reported feelings of depression in the time since the Court revoked his bond. *Id.* ¶ 64.

In addition to these mental ailments, Defendant has also been diagnosed with asthma and uses an inhaler daily. *Id.* ¶ 60. Furthermore, after his arrest for the instant offense, Defendant was admitted to Kings County Hospital where he was diagnosed with abdominal pain, and later with kidney issues and a possible ulcer or hernia. *Id.* Despite this diagnosis, Defendant has opted not to receive further treatment while incarcerated. *Id.*

### 5. Substance Abuse

Defendant reported struggling with substance abuse since he was seventeen years old. *Id.* ¶ 65. He began using marijuana daily at this age through his adulthood, as he claims it helps with his asthma, anxiety and depression. *Id.*

Defendant successfully completed drug and alcohol treatment in May 2021 while in state custody. *Id.* ¶ 66. He also attended the Pac Program in Brooklyn, New York in November 2021 while on parole. *Id.* ¶ 67.

Unfortunately, Defendant's drug treatment appears to have been short lived. Although he was directed to sign up with the Addicts Rehabilitation Center for substance abuse treatment, Defendant never enrolled. *Id.* ¶ 68. He also failed to remain sober while on home detention for the instant offence, despite a Court Order directing Defendant to abstain from illicit drug use. *Id.*; *see also* Violation of Release Conditions Report.

### 6. Nature and Circumstances of the Offense

The Court's previous statements make clear the nature and circumstances surrounding the instant offense. *See supra* at Section I.

### B. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Defendant's criminal history is serious, and there is a grave need to deter any future criminal conduct. The parties do not dispute this. The Government and Probation add the serious nature of the instant offense, the minimal deterrent effect Defendant's previous terms of incarceration have had on his criminal conduct, and the general lack of regard or respect for the rule of law this Defendant has shown through the course of his life warrant a lengthy term of incarceration. *See* Gov't Mem., ECF No. 27 at 3; Probation's Recommendation, ECF No. 22-1, at 2-3 ("It is clear from the defendant's criminal history and conduct while on bail, he is unwilling to abide by the law or respect authority. He has continued to commit crimes, and his prior sentences have not deterred him from doing so."). The parties also emphasize the disturbing nature of the instant offense is all the more reason the Court should impose a lengthy sentence as it was Defendant's own mother who informed law enforcement Defendant was armed and appeared to be dangerous. *See* Gov't Mem. at 3 ("The defendant's offense conduct . . . is indisputably serious. What is more, as noted above, the defendant's own mother felt it necessary to call 911 to report that the defendant had a firearm and to inform the operator where he was going with that firearm, all of which indicates that, but for his arrest, the defendant intended to use the firearm that night."). Defense counsel does not deny Defendant's past is troubling. Neither does defense counsel deny Defendant has benefitted from rehabilitative activities and programming geared towards substance

11

abuse recovery, anger management, and recreation while incarcerated at the Metropolitan Detention Center ("MDC"). Def. Mem., ECF No. 26 at 2-3. Defense counsel even noted Defendant's own father stated Defendant "needs a chance to adjust in society[,]" implying Defendant has failed to this point to integrate into his community and society writ large. PSR ¶ 57 (describing Defendant's father's statement).

### C.   The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to the sole count of an Indictment charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant faces various penalties for committing this offense, including terms of imprisonment and supervised release in addition to fines and a special assessment.

Specifically, Defendant faces a maximum term of imprisonment of ten years, and no minimum term of imprisonment. 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Pursuant to 18 U.S.C. § 3583(b)(2), Defendant faces a term of supervised release of not more than three years. Defendant is eligible for not less than one nor more than five years of probation, and one of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service. 18 U.S.C. §§ 3561(c)(1) and 3563(a)(2). Furthermore, the Court may impose a fine of not more than $250,000.00 pursuant to 18 U.S.C. § 3571(b). Defendant also faces forfeiture in accordance with paragraph six through eleven of his plea agreement. Plea Agreement, ECF No. 20 ¶¶ 6-11. The Court is also required to impose a mandatory special assessment of $100.00 per count in accordance with 18 U.S.C. § 3013.

In addition to these penalties, Defendant also faces various collateral consequences as a result of this felony conviction. *See* PSR ¶ 98.

### D.     The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

All parties agree with the Guidelines calculation set forth in the PSR, which proceeds as follows:

The guideline for this 18 U.S.C. § 922(g)(1) offense is USSG §2K2.1(a)(6)(A), which provides a base offense level of 14 as Defendant was previously convicted of a crime punishable by imprisonment for a term exceeding one year. PSR ¶ 14. Two-levels are added pursuant to USSG §2K2.1(b)(4)(A) because the firearm Defendant possessed was stolen. This results in an adjusted offense level of 16. PSR ¶ 19.

Defendant's offense level is decreased by two additional levels pursuant to USSG §3E1.1(a), which accounts for Defendant's acceptance of responsibility. Moreover, Defendant's offense level is decreased by one more level pursuant to USSG §3E1.1(b) because the Government was notified in a timely manner of Defendant's intention to plead guilty.

As the Court has discussed, Defendant's criminal history is extensive. PSR ¶¶ 24-41. Defendant is only thirty-four years old, yet he already has seventeen prior convictions. *Id.* Altogether, these convictions result in a criminal history score of 13 and a criminal history category of VI. *Id.* ¶ 43.

A total adjusted offense level of 13 combined with a criminal history category of VI results in a recommended Guidelines range of imprisonment of between 33 and 41 months. *Id.* ¶ 87.

The parties' Guidelines calculations mirror the analysis above. However, their sentencing recommendations differ slightly. The Government requests the Court impose a sentence within the Guidelines range. Gov't Mem. at 3. Noting the serious nature of Defendant's offense, as well as Defendant's history and characteristics, the need to deter this Defendant, and to protect the public at large, the Government recommends a term of between 33 and 41 months' imprisonment. *Id.* Probation also notes these factors but suggests a lengthier term of 53 months' imprisonment is more appropriate for this Defendant in accordance with the section 3553(a) factors. Probation's Recommendation at 3. In so saying, Probation notes: "[D]efendant's prior criminal history is significant and largely unaccounted for in the guideline calculations. It also indicates that the defendant is not willing to respect or follow authority or the law and must be incapacitated to protect the public. His traumatic childhood is a mitigating factor that has been considered, as but for this factor, a higher sentence would have been recommended.". *Id.* Probation also asks the Court to impose a sentence of three years' supervised release. *Id.* Such a term will, in Probation's view, "assist the defendant in reintegrating into society and to monitor his actions." *Id.*

Notably, defense counsel does not offer a sentencing recommendation to the Court beyond pleading with the Court to be as lenient as possible in accordance with the Parsimony Clause of 18 U.S.C. § 3553(A). Def. Mem. at 3. The Court acknowledges the two letters defense counsel filed as part of its sentencing submission: the first, from Defendant himself; the second, from Defendant's mother, Ms. Sharon McGriff. *See* Def. Addendum 1, ECF No. 28 (Defendant's letter to the Court); Def. Addendum 2, ECF No. 29 (Ms. McGriff's letter to the Court).

In Defendant's letter, he expresses remorse for his offense, as well as shame and regret for his past conduct. Def. Addendum 1. Defendant also recounts his difficult upbringing, his loss of direction, and the heartbreak he has experienced in his life. *Id.* He also shares his future goals,

including his desire to reenter society and become a productive and upright citizen. Defendant even notes he has employment plans following his release. *Id.*

Defendant's mother also pleads for leniency for her son. Def. Addendum 2. She shares her personal health struggles and gives the Court her account of the events which transpired before she called law enforcement on her son, which led to his instant arrest. *Id.* ("I called the police on my son to scare him so he would come back in the house."). Defendant's mother also asks the Court to give her son "another chance" and to give her one "last opportunity to get it right with [her] only child." *Id.*

The Court appreciates Ms. McGriff taking the time to write to the Court on behalf of her son. The Court has carefully considered both notes and has factored them into its sentencing decision.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

The parties have not drawn the Court's attention to any applicable policy statement here. Finding none on its own, the Court proceeds to the next 3553 factor.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires this Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The Court has premised its sentence around the nature and characteristics of *this* Defendant and of the instant crime of conviction. The Court has carefully considered the sentencing options

written into the statute and recommended by the Guidelines. In doing so, the Court has ensured the sentence it now imposes will avoid unwarranted sentence disparities.

### G. The Need to Provide Restitution

Lastly, the seventh § 3553(a) factor requires this Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Restitution is not applicable in this case.

Therefore, as there are no additional factors under section 3553 for the Court to address at this time, the Court is now prepared to announce its sentence.

### IV. CONCLUSION

For the reasons set forth above, the Court determines a sentence of 41 months of imprisonment to be followed by 3 years of supervised release with special conditions, forfeiture in accordance with the Order of Forfeiture, and a $100.00 mandatory special assessment is consistent with, and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2). The Court does not impose a fine because Defendant appears unable to pay a fine.

The Court expressly adopts the factual findings of the Presentence Investigation Report and the addenda thereto, barring any errors contained therein, to the extent they are not inconsistent with this opinion.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: June 2, 2023
      Brooklyn, New York